# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* Shannon Dunn and Michael Brandon Morgan,<br><br>Plaintiffs,<br><br>*v.*<br><br>LTC ACCOUNTING SERVICES, LLC, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 6:22-cv-138-JAR |

### OPINION AND ORDER

This matter comes before the Court on the motion to dismiss [Dkt. 110] and brief in support [Dkt. 111] filed on behalf of all defendants pursuant to Fed. R. Civ. P. 8(a), 9(b), 12(b)(1), and 12(b)(6). Plaintiffs Shannon Dunn and Michael Brandon Morgan (collectively, "Relators") submitted a response [Dkt. 121] and defendants filed a reply brief [Dkt. 124]. By express consent of all parties [Dkt. 118], and pursuant to Fed. R. Civ. P. 73(a) and 28 U.S.C. § 636(c)(1), the undersigned United States Magistrate Judge exercises complete jurisdiction over this action through and including trial and entry of a final judgment.

## I.    BACKGROUND

Relators filed this *qui tam* action on behalf of the United States of America pursuant to the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, against eighteen defendants: LTC Accounting Services, LLC ("LTC"), Kelly Mitchell ("Mitchell"), Philip Green ("Green"), Antlers Manor, LLC ("Antlers"), Medi-Plex Nursing Centers, Inc. d/b/a Boyce Manor Nursing Home ("Boyce"), Calera Manor, LLC ("Calera"),

Choctaw Nation Care Center, LLC ("Choctaw Nation"), Great Plains Care Center, Inc. d/b/a Cimarron Nursing Center ("Cimarron"), Colonial Terrace Care Center, LLC ("Colonial Terrace"), Shamrock Care Centers, LLC d/b/a First Shamrock Care Center ("Shamrock"), Homestead of Hugo, LLC ("Hugo"), Jan Frances Care Center, LLC ("Jan Frances"), Colonial Care Center, LLC d/b/a Meadowbrook Nursing Center ("Meadowbrook"), Salina Care Center, LLC d/b/a Parkhill North Nursing Home ("Salina"), Shady Rest Care Center, LLC ("Shady Rest"), Shawnee Care Center, LLC ("Shawnee"), Colbert Nursing Home, Inc. d/b/a Southern Pointe Living Center ("Southern Pointe"), and Talihina Manor, LLC ("Talihina"). [Dkt. 4]. On July 10, 2024, the United States notified the Court that it would not intervene in this action. [Dkt. 13]. *See* 31 U.S.C. § 3730(b)(2).

The following facts are alleged in the second amended complaint ("SAC"). Relators are former employees of defendant LTC, which is an Oklahoma limited liability company that manages, controls, and maintains the policies and operations of the other fifteen corporate defendants and their respective skilled nursing facilities (collectively, "Facility Defendants").[1] [Dkt. 104, ¶¶ 19-22]. Relator Shannon Dunn served as a Nurse and Administrator Consultant for LTC from 2018 to March 2022, during which time she oversaw seven facilities: Cimmaron, Colonial Terrace, Shamrock, Shady Rest, Meadowbrook, Salina, and Shawnee (the "northern facilities"). [*Id.* ¶ 19]. Relator Michael Brandon Morgan was employed by LTC as Chief Financial Officer ("CFO") from May 2010 to December 2024 and served as the

---

[1] Defendants Mitchell and Green each hold a 25% ownership interest in LTC and jointly oversee the management of Facility Defendants. [Dkt. 104, ¶¶ 23-24].

*de facto* Chief Operating Officer ("COO") for the northern facilities from November 2018 until August 2021. [*Id*. ¶ 20]. In the course of performing their duties, Relators assert they observed numerous practices by defendants that purportedly violated the FCA. [*Id*. ¶¶ 59-61, 77-101]. After expressing concerns that all defendants were engaging in fraudulent activity, Relator Dunn's employment with LTC was terminated in March 2022 and Relator Morgan's employment was terminated by Mitchell and Green in December 2024. [*Id*. ¶¶ 84-119].

Based on these facts, Relators assert eight causes of action: (1) presentation of false claims to Centers for Medicare & Medicaid Services ("CMS") and/or its Medicare Administrative Contractor ("MAC"), in violation of 31 U.S.C. § 3729(a)(1)(A); (2) making or using a false record or statement to get false claims paid or approved by CMS and/or its MAC, in violation of § 3729(a)(1)(B); (3) presentation of false or fraudulent Paycheck Protection Plan ("PPP") loan applications to lenders, in violation of § 3729(a)(1)(A); (4) making or using a false record or statement material to false or fraudulent PPP loan applications, in violation of § 3729(a)(1)(B); (5) presentation of false or fraudulent Provider Relief Fund ("PRF") grant applications, in violation of § 3729(a)(1)(A); (6) making or using a false record or statement material to false or fraudulent PRF grant applications, in violation of § 3729(a)(1)(B); (7) knowingly retaining funds obtained through false or fraudulent PRF grant applications, in violation of § 3720(a)(1)(G); and (8) retaliatory discharge of Relator Morgan by defendants Mitchell, Green, and LTC, in violation of § 3730(h).

## II.   SUBJECT MATTER JURISDICTION

As a threshold matter, defendants contend that Relator Dunn lacks standing pursuant to a settlement agreement in a previous case, thereby challenging the Court's subject matter jurisdiction over her claims. A Rule 12(b)(1) motion may present a factual attack on jurisdiction, and in doing so the Court may consider materials outside the pleadings without converting the motion to one for summary judgment so long as the jurisdictional issue is not intertwined with the merits. *See Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004); *Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001). Here, the jurisdictional issue is distinct from the merits of Relators' FCA allegations.

After commencing this *qui tam* action, Relator Dunn entered into a settlement agreement and release (the "Release") resolving a separate employment dispute against defendants LTC and Cimarron, as well as her former supervisor, Kathy Chappell. [Dkt. 111-1 at 1]. The Release extends to "any and all claims" Dunn had or could have had against those parties and their owners or affiliates, including any entitlement to monetary recovery "arising out of, related to, or resulting from" her employment or separation from employment. [*Id.* ¶ 1.2]. Defendants argue that, by executing the Release, Dunn relinquished any legally protected interest in this *qui tam* action and therefore lacks standing.

The FCA is designed to deter and redress fraud against the government, and its *qui tam* provisions incentivize private enforcement by granting relators a share of any recovery. *U.S. ex rel. Ritchie v. Lockheed Martin Corp.*, 558 F.3d 1161, 1168 (10th

Cir. 2009). Settlements purporting to release *qui tam* claims therefore implicate a federal interest in ensuring that fraud is disclosed and that the United States' recovery is not compromised by private bargains between contractors and potential relators. *Id*. at 1168-69. Where that federal interest significantly conflicts with the application of state contract law principles, federal common law governs enforceability of such releases. *See id*.; *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988).

Both parties rely on *Ritchie*, in which the Tenth Circuit adopted the Ninth Circuit's framework: a release of *qui tam* claims is enforceable if (1) its terms fairly encompass FCA claims and (2) the interest in enforcing the release outweighs the federal interest in uncovering and prosecuting fraud. *Ritchie*, 558 F.3d at 1169-71; *U.S. ex rel. Green v. Northrop Corp.*, 59 F.3d 953, 960 (9th Cir. 1995); *U.S. ex rel. Hall v. Teledyne Wah Chang Albany*, 104 F.3d 230, 232-34 (9th Cir. 1997). In *Green*, the relator settled state-law employment claims by signing a broad release before the government learned of the alleged fraud, and the Ninth Circuit held the release unenforceable against a subsequent *qui tam* suit because the strong public interest in detecting and remedying fraud outweighed the policy favoring settlements where the government had no prior notice. 59 F.3d at 956-69. In *Hall*, by contrast, the government had been informed of the alleged fraud, had investigated, and deemed the claims baseless before the relator executed his release; under those circumstances, the Ninth Circuit enforced the release, concluding that no

5

countervailing federal policy outweighed the general preference for honoring settlements. 104 F.3d at 231-32.

Applying this framework here, the Court first concludes that the Release is broad enough to encompass Dunn's personal *qui tam* recovery interest, and thus satisfies the first *Ritchie* prong. As to the second prong, the record reflects that Dunn filed this *qui tam* action under seal in May 2022 and executed the Release in July 2023, after the government had been notified of the fraud allegations through the original complaint. Unlike *Green*, this is not a case in which a relator privately settled before the government learned of the alleged fraud. However, the government's subsequent notice of non-intervention, filed in July 2024, expressly stated that its investigation "has not been completed" and "will continue," and that the United States was "not able to decide" as of the Court's deadline whether to proceed with the action. [Dkt. 13 at 1-2]. The Court therefore cannot conclude, as in *Hall* and *Ritchie*, that the government had already conducted a thorough inquiry and determined the allegations to be unfounded, or otherwise had a fully adequate opportunity to evaluate its enforcement interest by the time Dunn signed her Release. Whether enforcement of the Release would, in fact, materially impair the United States' ability to uncover or prosecute fraud turns on factual questions—such as the extent of any disclosures by defendants and the status and scope of the government's investigation as of July 2023—that are beyond the current record.

Thus, while the Court may properly consider the Release in the context of a factual Rule 12(b)(1) challenge, it is incapable of resolving the public-policy

6

component of the _Ritchie_ test on the present record. The issue is more appropriately treated as an affirmative defense to be addressed at summary judgment or following limited discovery concerning government knowledge and disclosure. The Court therefore declines, at this stage, to conclude that the Release deprives Relator Dunn of standing. In any event, defendants do not dispute that Relator Morgan—who executed no release and whose interests are independent—retains standing to pursue the FCA claims on behalf of the United States. Accordingly, the Court's subject matter jurisdiction over this action as a whole remains secure irrespective of Relator Dunn's ultimate status.

## III.  STANDARDS OF REVIEW

Defendants further assert that Relators' FCA claims are subject to dismissal pursuant to Rule 12(b)(6), Rule 8(a), and Rule 9(b) because the allegations (a) fail to state a claim for an FCA violation or retaliatory discharge, (b) do not meet minimum pleading requirements, and/or (c) are not pled with the requisite particularity.

### A.  RULE 12(B)(6)

To withstand a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" _Ashcroft v. Iqbal_, 556 U.S. 662, 678 (2009) (_quoting Bell Atl. Corp. v. Twombly_, 550 U.S. 554, 570 (2007)). A claim is plausible when the pleaded facts allow the Court to draw a reasonable inference that the defendant is liable for the alleged misconduct. _Id_. The Court disregards legal conclusions and "[t]hreadbare recitals of the elements of a cause of action." _Id_.; _see also Kansas Penn Gaming, LLC_

7

*v. Collins*, 656 F.3d 1210, 1214-15 (10th Cir. 2011). The question is whether the complaint alleges facts supporting all elements necessary to relief under the proposed legal theories. *Lane v. Simon*, 495 F.3d 1182, 1186 (10th Cir. 2007).

## B.   RULE 8(A)

Rule 8(a) requires, in part, that a plaintiff submit in her complaint "(1) a short and plain statement of the grounds upon which the court's jurisdiction depends, ... [and] (2) a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Rule 8(a)'s "short and plain statement" requirement is "to give opposing parties fair notice of the basis of the claim against them so that they may respond to the complaint, and to apprise the court of sufficient allegations to allow it to conclude, if the allegations are proved, that the claimant has a legal right to relief." *Monument Builders of Greater Kan. City, Inc. v. Am. Cemetery Ass'n of Kan.*, 891 F.2d 1473, 1480 (10th Cir. 1989) (quotation omitted). "The degree of specificity necessary to establish plausibility and fair notice [under Rule 8] and therefore the need to include sufficient factual allegations, depends on context[.]" *Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008).

## C.   RULE 9(B)

Because FCA claims necessarily involve fraudulent conduct, Rule 9(b)'s heightened pleading requirements apply. *See Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 727 (10th Cir. 2006). Rule 9(b) provides that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake, "although "[m]alice, intent, knowledge, and other

conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). A plaintiff must, at a minimum, set forth the "who, what, when, where, and how of the alleged fraud" as well as the "time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof" in order to comply with Rule 9(b). *Sikkenga*, 472 F.3d at 726-27.

In the specific context of an FCA claim, it is not enough for a relator to provide details regarding an underlying fraudulent scheme leading to FCA violations. In order to satisfy Rule 9(b), such allegations of wrongful activities must be "linked to allegations, stated with particularity, of the actual false claims submitted to the government." *Id*. at 727 (quotation omitted). Therefore, a relator cannot "allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted." *Id*. (quotation omitted). Instead, Rule 9(b) requires a relator to provide "details that identify particular false claims for payment that were submitted to the government." *Id*. (quotation omitted).

Thus, in order to meet their burden at the motion to dismiss stage, Relators must allege sufficient details regarding the underlying fraudulent scheme or practices. Relators must also allege at least some of the following details for some of the false claims submitted as a result of the alleged wrongful practices: (1) the dates of the false claims, (2) the content and identification numbers of the forms or the bills submitted, (3) the fees charged to the government, (4) the goods and services for which the government was billed, (5) the persons involved in the billing, and (6) the length

of time between the alleged fraudulent practices and the submission of the claims based on those practices. *See id.* (stating that above list is not a "checklist of mandatory requirements" and that merely "some of this information, for at least some of the claims must be pleaded in order to satisfy Rule 9(b)").

## IV. OVERVIEW OF FALSE CLAIMS ACT

As a general matter, "[t]he FCA covers all fraudulent attempts to cause the government to pay out sums of money." *U.S. ex rel. Conner v. Salina Reg'l Health Ctr.*, 543 F.3d 1211, 1217 (10th Cir. 2008) (internal quotation omitted). Relevant to this case, the FCA prohibits:

> (A) knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim; [and]
>
> \*\*\*
>
> (G) knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowing conceal[ing] and improperly avoid[ing] or decreas[ing] an obligation to pay or transmit money or property to the Government.

31 U.S.C. §§ 3729(a)(1)(A), (B), (G).

### A. SECTION 3729(a)(1)(A) CLAIMS

Section 3729(a)(1)(A) imposes liability on persons who knowingly present, or cause to be presented, a false or fraudulent claim for payment to the government. 31 U.S.C. § 3729(a)(1)(A). "In order to establish a violation of § 3729(a)(1)(A), 'a plaintiff must show by a preponderance of the evidence that: (1) a false or fraudulent claim (2) is presented to the United States for payment or approval (3) with knowledge that

10

the claim is false or fraudulent.'" *U.S. ex rel. Troxler v. Warren Clinic, Inc.*, No. 11-CV-808-TCK-FHM, 2014 WL 5704884 at \*2 (N.D. Okla. Nov. 5, 2014) (*quoting U.S. ex rel. Trim v. McKean*, 31 F.Supp.2d 1308, 1315 (W.D. Okla. 1998)).

The FCA recognizes two types of actionable claims: factually false claims and legally false claims. *Conner*, 543 F.3d at 1217. "Factually false claims" require proof that "the government payee has submitted 'an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided. *Id*. (citation omitted). "'Claims arising from legally false requests, on the other hand, generally require knowingly false certification of compliance with a regulation or contractual provision as a condition of payment.'" *U.S. ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1168 (10th Cir. 2010).

The Tenth Circuit has recognized two forms of legally false claims with respect to § 3729(a)(1)(A): express false certification and implied false certification. *Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 531-32 (10th Cir. 2000). "Claims under an express-false-certification theory arise when a payee 'falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment.'" *Lemmon*, 614 F.3d at 1168 (*quoting Conner*, 543 F.3d at 1217). "The payee's 'certification' need not be a literal certification, but can be any false statement that relates to a claim." *Id*.; *see also Conner*, 543 F.3d at 1217 (opining that certifications may be made through "invoices or other express means").

In contrast, an implied false certification claim does not require a false representation, but may result from a material omission—specifically, that the payee

11

failed to comply with a material statutory, regulatory or contractual requirement. *See*

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 181 (2016). Under

an implied false certification theory, "liability can attach when the defendant submits

a claim for payment that makes specific representations about the goods or services

provided, but knowingly fails to disclose the defendant's noncompliance with a

statutory, regulatory, or contractual requirement. In these circumstances, liability

may attach if the omission renders those representations misleading." *Id*.

### B.    SECTION 3729(a)(1)(B) CLAIMS

Section 3729(a)(1)(B) prohibits the use of a false record or statement in order

to demonstrate to the government that a false or fraudulent claim should be paid. 31

U.S.C. § 3729(a)(1)(B). Liability under § 3729(a)(1)(B) requires proof of the following:

"'(1) a false record or statement (2) is used to cause the United States to pay or

approve a fraudulent claim (3) with the defendant's knowledge of the falsity of the

record or statement.'" *Troxler*, 2014 WL 5704884 at *2 (*quoting Trim*, 31 F.Supp.2d

at 1315). In contrast to § 3729(a)(1)(A), only factually false claims and express false

certification claims are actionable under § 3729(a)(1)(B). *See Shaw*, 213 F.3d at 531-

32.[2] Due to the false record or statement requirement, an implied false certification

claim does not exist under § 3729(a)(1)(B). *Id*.; *see also Lemmon*, 614 F.3d at 1168.

### C.    SECTION 3729(a)(1)(G) CLAIMS

Section 3729(a)(1)(G) is commonly referred to as the "reverse false claims"

provision, and prohibits "knowingly mak[ing], us[ing], or caus[ing] to be made or

---

[2] Both *Lemmon* and *Shaw* analyzed § 3729(a)(2), which was renumbered to § 3729(a)(1)(B) by passage of the Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, 123 Stat. 1616 (2009).

used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceal[ing] or knowingly and improperly avoid[ing] or decreas[ing] an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G); *U.S. ex. rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1194 (10th Cir. 2006). "A reverse false claim is documentation resulting in an underpayment to the Government, as opposed to a false claim, generally referring to an inflated or false bill for payment from the Government." *U.S. ex rel. Grynberg v. Praxair, Inc.*, 389 F.3d 1038, 1041 n.2 (10th Cir. 2004). Section 3729(a)(1)(G) "was added to 'provide that an individual who makes a material misrepresentation to avoid paying money owed the Government would be equally liable under the Act as if he had submitted a false claim to receive money.'" *Bahrani*, 465 F.3d at 1194 (quotation omitted).

To prove a reverse false claim under § 3729(a)(1)(G), a relator must show that: "'(1) the defendant knowingly made a materially false record or statement; (2) to improperly avoid or decrease an obligation to pay or transmit money or property to the government.'" *U.S. ex rel. Wagner v. Care Plus Home Health Care, Inc.*, No. 15-CV-260-GKF-JFJ, 2017 WL 6329850 at *6 (N.D. Okla. Dec. 11, 2017) (quotation omitted); *see also Little v. ENI Petroleum Co., Inc.*, No. 06-CV-120-M, 2009 WL 2424215 at *2 (W.D. Okla. July 31, 2009) ("[I]n order to establish defendants' liability for the alleged reverse false claims, [relator] must show that (1) defendants made or used statements in order to avoid or decrease their obligation to pay money to the

13

government; (2) the statements were false or fraudulent; and (3) defendants knew the statements were false or fraudulent.").

## V.    ANALYSIS

### A.    ALLEGED PROVIDER RELIEF FUND (PRF) FRAUD

In March 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), which established the PRF to distribute over $100 billion "to prevent, prepare for, and respond to coronavirus" and to reimburse eligible providers for "health care related expenses or lost revenues that are attributable to coronavirus." Pub. L. No. 116-136, 134 Stat. 281, 563 (2020). The Department of Health and Human Services ("HHS") delegated administration of the PRF to the Health Resources and Services Administration ("HRSA"), which issued both General Distributions and Targeted Distributions to eligible providers. As relevant here:

- Phase 1 General Distributions required no applications and were paid as automatic "push" payments to Medicare fee-for-service providers, using 2019 claims and banking data.[3]

- Phases 2 through 4 General Distributions required providers to apply and to submit detailed financial information through an HRSA portal, including data on revenues, COVID-related expenses, and lost revenues.[4]

- Targeted Distributions were directed to providers particularly impacted by COVID-19, including skilled nursing facilities ("SNFs"), using CMS certification and bed-count data; eligible SNFs with active certification and a minimum number of certified beds received automatic PRF payments without an application.[5]

---

[3] *See* HEALTH RES. & SERVS. ADMIN., PRF Terms and Conditions, https://www.hrsa.gov/provider-relief/past-payments/terms-conditions (last visited Mar. 5, 2026).

[4] *See id.*

[5] *See* HEALTH RES. & SERVS. ADMIN., PRF Programs: PRF and ARP Rural Payments FAQs, (Sept. 30, 2025), https://www.hrsa.gov/sites/default/files/hrsa/providerrelief/provider-relief-fund-faq-complete.pdf.

14

By retaining PRF funds, providers were deemed to accept PRF terms and conditions requiring, *inter alia*, that: (i) payments be used only to prevent, prepare for, and respond to COVID-19 and to reimburse COVID-attributable expenses or lost revenues; (ii) duplicative reimbursement be avoided; (iii) recipients truthfully and completely comply with HHS reporting requirements; and (iv) recipients maintain supporting records and cost documentation.[6] Recipients were also required to submit post-payment attestations regarding their PRF uses and return unused funds.[7]

Relators allege that Facility Defendants—fifteen commonly managed SNFs operated through LTC and entities associated with Mitchell and Green—applied for, accepted, and collectively received more than $11.7 million in PRF funds in 2020 and 2021, listing them as "Medicare stimulus" in their yearly profit-loss ledger. [Dkt. 104, ¶¶ 2, 21-26, 56 & tbl. (listing facility-by-facility PRF payment amounts and dates), 57]. They further allege that Mitchell directed Relator Morgan (i) to treat most PRF payments as unrestricted "income,"[8] causing aggregate revenue to increase from about $5.3 million in 2019 to $18.8 million in 2020, with 2021 income still more than double 2019, and (ii) to submit PRF reports to HRSA falsely certifying the funds had been used for eligible purposes so that Facility Defendants would not be required to repay them. [*Id.* ¶¶ 59-60, 62]. According to Relators, instead of being used for COVID-related costs, these PRF funds (together with PPP funds) were diverted to

---

[6] *See* PRF Terms and Conditions, *supra*, n.3.

[7] *See* HEALTH RES. & SERVS. ADMIN., Returning PRF Funds, https://www.hrsa.gov/provider-relief/compliance/returning-funds (last visited Mar. 10, 2026); *see also* 2 C.F.R. § 200.346.

[8] In their response, Relators note that "[t]he SAC mistakenly asserts that Mitchell instructed Morgan to categorize the [PRF] funds as "*net* income." [Dkt. 121 at 16 & n.5].

finance unusually large shareholder distributions—approximately $4.7 million in 2020 and $10.9 million in 2021—to Mitchell, Green, family trusts and LLCs they control, and Mitchell's siblings. [*Id.* ¶¶ 3, 61, 80-83; Dkt. 104-2  at 3 (Aug. 12, 2021 email attachment listing facility-by-facility cash balances, planned distributions, and their allocation among eight identified shareholders)].

### 1.    Count V | Presentation of False Claims (Express False Certification)

Count V alleges that defendants knowingly presented, or caused to be presented, false claims by submitting PRF grant applications that fraudulently certified compliance with PRF terms and conditions and misstated revenue losses and pandemic-related expenses, thereby obtaining millions in PRF funds in violation of 31 U.S.C. § 3729(a)(1)(A). [Dkt. 104, ¶¶ 186-94]. Under Tenth Circuit precedent, a claim under §3729(a)(1)(A) must plausibly allege a knowingly false representation and a "claim" for government money or property, evaluated under Rule 8(a) and Rule 9(b) together. *See* <u>*Trim*</u>, 31 F.Supp.2d at 1315; <u>*Sikkenga*</u>, 472 F.3d at 727. An express-false-certification theory applies where a payee "falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment." <u>*Lemmon*</u>, 614 F.3d at 1168; *see* <u>*Conner*</u>, 543 F.3d at 1217 (noting that false certifications may be made through "invoices or other express means").

Defendants first contend that because SNFs were not required to submit affirmative requests or demands for Targeted Distributions, Relators have not alleged that any defendant submitted a "claim" at all. However, defendants do not dispute that providers were required to apply for later-phase General Distributions

16

by submitting financial information and that PRF recipients, including SNFs, were obligated to submit post-payment reports and attestations certifying eligible use of funds regardless off the distribution type. *See* [Dkt. 104, ¶¶ 122-27].[9] Those applications and attestations are alleged to have been submitted by or on behalf of the SNF enterprise controlled by LTC, Mitchell, and Green. [*Id.* ¶¶ 56 & tbl., 57, 59-62]. Taken as true, these allegations identify concrete vehicles—applications for Phases 2 through 4 General Distributions and required HRSA reports—through which expressly false certifications were purportedly presented. The SAC also identifies "who" was involved by naming Green, Mitchell, and each Facility Defendant as participants in the alleged PRF scheme. [*Id.* ¶ 56 & tbl., 59, 62, 80-83].

Defendants next contend that recording PRF receipts as "income" and realizing higher 2020-2021 net profits is consistent with lawful conduct and, standing alone, does not establish misuse or falsity. That contention would carry more weight if Relators' theory were confined to profitability. But the SAC goes further, alleging that PRF inflows were routed into extraordinary shareholder distributions and that Mitchell directed the reclassification and shifting of accounting entries before submitting HRSA reports that concealed this alleged misuse by falsely characterizing PRF funds as having been expended on eligible uses. [*Id.* ¶ 62, 74]. The "what" thus consists of false certifications in PRF applications and HRSA post-payment reports

---

[9] *See also* PRF Terms and Conditions, *supra*, n.3. While the SAC does not specify whether each PRF payment constituted a General or Targeted Distribution, that omission does not alone undermine Relators' PRF fraud claims. Under Rule 9(b), Relators are required only to allege the "who, what, when, where, and how" of the alleged fraud by setting forth "the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof." <u>Sikkenga</u>, 472 F.3d at 727.

17

that PRF funds would be and were used solely for COVID-related expenses and lost revenues, when substantial portions were instead diverted to shareholder distributions unrelated to COVID-19 response. The alleged "how" is supplied by assertions that Mitchell directed Relator Morgan, in his capacity as CFO, to record PRF receipts as unrestricted income, to shift expenses among facilities to create the appearance of eligible use, and then to submit or cause the submission of HRSA reports that misrepresented the true deployment of PRF dollars. Viewed against the backdrop of LTC's alleged control over billing, bookkeeping, and financial reporting for all Facility Defendants, these allegations adequately link the alleged scheme to the submission of false PRF-related certifications.

The SAC also pleads "where" and "when" with adequate specificity: Relator Morgan is alleged to have performed these functions while employed by LTC in Sallisaw, Oklahoma during the 2020-2021 period in which the PRF payments and shareholder distributions occurred. [*Id.* ¶¶ 20-21, 56, 59, 62, 80-83]. Taken together, Relators' allegations describe the nature of the misrepresentations, the means by which they were communicated to the government, the individuals and entities involved, and the time and place of the alleged conduct. Under the Tenth Circuit's Rule 9(b) jurisprudence, which does not require attachment of exemplar claims so long as the complaint describes the fraudulent scheme with particularity and provides a reasonable basis to infer that false claims were submitted, the Court finds that Count V is pleaded with sufficient particularity to withstand defendants' motion to dismiss.

### 2.    Count VI | False Record or Statement (Express False Certification)

Count VI alleges that defendants made, used, or caused to be made or used false records or statements—including PRF applications, HRSA attestations, and related financial documents—material to obtaining PRF payments, in violation of 31 U.S.C. § 3729(a)(1)(B). [Dkt. 104, ¶¶ 196-199]. The legal inquiry largely parallels Count V, except that § 3729(a)(1)(B) addresses false records or statements that are material to a claim, rather than the act of presenting the claim itself. *See* *Trim*, 31 F.Supp.2d at 1315. As discussed above, Relators' PRF-related allegations sufficiently identify the "who, what, when, where and how" of the alleged false records and reasonably link them to both eligibility for, and retention of, PRF funds. Defendants' contention that higher revenue may simply reflect lawful PRF use presents a factual dispute, not a pleading deficiency, because it goes to whether their reported "COVID-related expenses" and "lost revenues" were accurate and whether any portion of the large dividend payments were effectively financed with PRF dollars. In light of the allegations of centralized financial control by LTC, the specific PRF and dividend amounts pled, and Mitchell's alleged directives to Relator Morgan, the Court concludes Relators have plausibly alleged that false records or statements materially influenced defendants' receipt and retention of PRF funds.

### 3.    Count VII | Reverse False Claim

Count VII asserts a reverse-false-claim theory under 31 U.S.C. § 3729(a)(1)(G), alleging that defendants falsely certified in HRSA attestations and reports that PRF funds had been spent on eligible uses when, instead, they had treated the funds as

profit and converted most of them to shareholder dividends, thereby avoiding their obligation to return ineligible PRF funds. [Dkt. 104, ¶¶ 202-204]. A reverse false claim requires allegations of (1) a cognizable "obligation" to pay or transmit money or property to the United States—which may arise from statutes, regulations, or contractual terms—and (2) knowing avoidance or decrease of that obligation through false statements or concealment. *See e.g.*, <u>Wagner</u>, 2017 WL 6329850 at *6; <u>Little</u>, 2009 WL 2424215 at *2. Relators tie the obligation element to PRF terms and conditions and federal grant requirements mandating the return of unused or improperly used funds, and allege that defendants knowingly avoided that obligation by submitting reports that mischaracterized the use of PRF monies as eligible COVID-related expenses. [*Id*. ¶¶ 3, 58-62, 126-27]. The Court has already concluded that Relator' PRF-related allegations are pled with sufficient particularity to satisfy Rule 9(b)'s requirements for FCA claims.

Defendants' "no claim" argument has limited relevance in this context, as § 3729(a)(1)(G) does not require a request for payment but instead addresses the knowing retention or improper avoidance of an existing obligation. *See* <u>Grynberg</u>, 389 F.3d at 1041 & n.2. In light of the alleged magnitude of PRF receipts, the claimed funneling of those funds into large shareholder distributions, and the assertedly false reporting to HRSA, the Court concludes Relators have stated a plausible reverse-false-claim theory under governing Tenth Circuit standards. Whether defendants can ultimately show that PRF dollars were fully offset by eligible uses is a merits issue not suitable for resolution at the pleading stage.

## B.    ALLEGED PAYCHECK PROTECTION PROGRAM (PPP) FRAUD

The PPP was created under the CARES Act as a temporary expansion of the Small Business Administration's ("SBA") 7(a) loan program to provide fully guaranteed, forgivable loans to eligible small businesses, including nursing care facilities, to cover specified COVID-related payroll and operating costs. *See* Pub. L. No. 116-136, 34 Stat. 281, 286-94; 15 U.S.C. § 636(a)(36). Nursing facilities such as Facility Defendants could qualify if, at the time of application, they met the applicable SBA size criteria (including employee-based and revenue-based standards) once all "affiliates" properly aggregated under SBA's affiliation rules, and if they were not otherwise disqualified by statute or regulation. *See* 15 U.S.C. § 636(a)(36)(D); 13 C.F.R. pt. 121.[10] Eligibility thus turned not only on the nominal size of each licensed facility but also on whether, in economic reality, a group of commonly owned and/or controlled facilities constituted a single small business concern whose employees and gross receipts had to be counted together for PPP purposes. *See* 13 C.F.R. §§ 121.103, 121.201, 121.301(f). This is precisely the point in dispute with respect to Relators' PPP-related claims. *See* [Dkt. 104, ¶¶ 64-79; Dkt. 111 at 20-21].

To obtain a PPP loan, each facility (or the central management entity acting for it) submitted a borrower application to an approved PPP lender on the standard PPP Borrower Application Form in effect at the time.[11] On that form, an authorized

---

[10] *See also* Business Loan Program Changes; Paycheck Protection Program, 85 Fed. Reg. 20,811, 20,812-15 (Apr. 15, 2020) (hereinafter "PPP Interim Final Rule I"); SMALL BUS. ADMIN., Affiliation Rules Applicable to SBA Paycheck Protection Program (Apr. 3, 2020), https://home.treasury .gov/system/files/136/Affiliation%20rules%20overview%20(for%20public).pdf.

[11] *See* U.S. DEP'T OF TREASURY, PPP: Borrower Application Form (SBA Form 2483, rev. June 12, 2020), https://home.treasury.gov/system/files/136/PPP-Borrower-Application-Form-Revised-June-

21

representative was required to make a series of express certifications under penalty of law.[12] Among other things, the representative had to certify (i) that the applicant "is eligible to receive a loan" under the PPP rules; (ii) that it has applied the correct SBA size-standard and affiliation rules in counting its employees and/or gross receipts; (iii) that it has accurately calculated average monthly payroll costs and the resulting loan requests; (iv) that is has disclosed all ownership information and considered required affiliates; and (v) that the loan is necessary to support ongoing operations in light of the economic uncertainty caused by the pandemic.[13] The applicant also had to certify that loan proceeds would be used only for authorized PPP purposes—primarily payroll, and otherwise limited to certain defined business obligations such as rent, utilities, and interest on secured debt—and that any misuse could result in forfeiture of forgiveness and additional liability.[14]

PPP loan amounts were constrained for Facility Defendants in at least two ways. First, for a first-draw loan, the maximum principal amount for a first-draw loan was generally capped at 2.5 times the borrower's average monthly payroll costs during a prescribed base period, subject to an absolute program cap per borrower. *See* 15 U.S.C. § 636(a)(36)(E).[15] Thus, the aggregate payroll represented in the applications must have been large enough to justify the nearly $4 million in PPP

---

2020.pdf; U.S. DEP'T OF TREASURY, PPP: Borrower Application Form (SBA Form 2483, rev. Mar. 18, 2021), https://home.treasury.gov/system /files/136/PPP-Borrower-Application-Form.pdf.

[12] *See* SBA Form 2438 at 2-3, *supra*, n.11.

[13] *See id*; PPP Interim Final Rule I, 85 Fed. Reg. at 20,813-15; U.S. DEP'T OF TREASURY, PPP Loans: FAQs, at 1-4, 15-17 (May 9, 2024), https://home.treasury.gov/system/files/136/FAQ-PPP-for-Borrowers-and-Lenders-Questions-1-72-V13.pdf.

[14] *See* SBA Form 2438 at 2-3, *supra*, n.11; PPP Final Rule I, 85 Fed. Reg. at 20,814-15.

[15] *See also* PPP Final Rule I, 85 Fed. Reg. at 20,814-15; PPP Loans: FAQs, at 1-3, *supra*, n.13.

loans Relators allege were obtained. *See* [Dkt. 104, ¶ 63 & tbl. (listing facility-by-facility PPP loan amounts and dates)]. Second, PPP forgiveness rules effectively limited how those funds could be used: to receive full forgiveness, at least 60% of the forgiven amount had to be spent on payroll costs and the balance could be applied only to specified non-payroll expenses, with forgiveness further conditioned on maintaining employee headcount and wage levels.[16]

Relators allege that defendants' enterprise treated PPP proceeds as fungible "stimulus" and, together with PRF inflows, converted most of the combined federal support into extraordinary shareholder distributions. *See* [Dkt. 104, ¶¶ 59-62, 80-83 (alleging categorization of PRF as income and a combined $15.6 million in stimulus largely paid out as dividends)]. Taken as true, those allegations directly implicate the accuracy of defendants' use-of-funds and eligibility certifications at loan origination and at forgiveness.

### 1.    Count III | Presentation of False Claims (Express False Certification)

Count III alleges that each PPP application defendants submitted constituted a false claim because Facility Defendants failed to disclose required affiliates and falsely certified their eligibility and compliance with PPP requirements, thereby obtaining more than $3.9 million in PPP loans in violation of 31 U.S.C. § 3729(a)(1)(A). [Dkt. 104, ¶¶ 172-176, 178]. Relators further allege that, because the

---

[16] *See* Paycheck Program Flexibility Act of 2020, <u>Pub. L. No. 16-142, 134 Stat. 641, 642</u>; Business Loan Program Temporary Changes; Paycheck Protection Program—Revisions to Loan Forgiveness and Loan Review Procedures Interim Final Rules, 85 Fed. Reg. 38,304, 38,205-06 (June 26, 2020); PPP Loans: FAQs, at 18-24, *supra*, n.13.

loans were government-guaranteed and forgiveness shifted any loss to the federal government, these misrepresentations were material to the SBA's decisions to guarantee and later forgive defendants' PPP loans. [*Id.* ¶ 177]. *See* <u>Lemmon</u>, 614 F.3d at 1168 (describing the contours of an express-false-certification theory).

Defendants argue that the SAC fails to plead falsity because Relators do not negate defendants' asserted eligibility under what they describe as three alternative PPP eligibility pathways. That contention misreads the governing framework. Under the SBA's regulations, PPP size eligibility is determined based on "the size of the applicant together with its affiliates," and SBA's PPP-specific interim final rule instructs that "borrowers must apply the affiliation rules that appear in 13 C.F.R. § 121.301(f)" when determining PPP eligibility. <u>13 C.F.R. § 121.301</u>.[17] Those affiliation principles apply to commonly owned and commonly controlled businesses in the same manner as to any other applicant and require aggregation of entities under common ownership or control when applying the relevant employee- or receipts-based size standards. Thus, the PPP criteria that defendants characterize as "alternative" pathways—such as operation of the statutory date, qualification as an enumerated entity type, or satisfaction of necessity and (for second-draw loans) revenue-reduction thresholds—do not create independent avenues for ignoring affiliation. They presuppose that the borrower qualifies as a "small" concern after affiliates are aggregated under § 121.301(f). An applicant that exceeds the applicable SBA size

---

[17] *See also* Business Loan Program Temporary Changes; Paycheck Protection Program—Requirements—Promissory Notes, Authorizations, Affiliation, and Eligibility, 85 Fed. Reg. 23,450, 23, 451 (April 28, 2020) (hereinafter, "PPP Interim Final Rule II").

standard after properly including its affiliates' employees or receipts is ineligible for PPP relief regardless of its operational status, organizational form, or pandemic-related financial distress.

The SAC alleges that Facility Defendants are commonly owned through interlocking family trusts and LLCs, centrally managed and controlled by LTC and its principals, and at times presented as a unified enterprise for other purposes. [*Id.* ¶¶ 64-75; Dkt. 104-1]. Under SBA's affiliation rules, those allegations are sufficient at the pleading stage to support a reasonable inference that Facility Defendants are affiliates whose gross receipts must be aggregated for PPP-size purposes. On the pleaded numbers—aggregate receipts alleged to be approximately twice the then-applicable $30 million receipts-based size standard for NAICS 623110—Relators plausibly allege that defendants, viewed as an affiliated group, were categorically ineligible for PPP loans. [*Id.* ¶¶ 6, 77-78]. According to the SAC, however, each Facility Defendant applied separately, failed to disclose its affiliates, and certified PPP eligibility as though it were unaffiliated and individually small. [*Id.* ¶ 79].

Under the governing PPP and SBA framework, such deliberate "carving up" of a commonly controlled enterprise into nominally small borrowers while omitting required affiliates does not generate "separate paths" to eligibility; it results in false size and affiliation certifications as to each loan application. *See* 13 C.F.R. § 121.301.[18] At the Rule 12(b)(6) stage, detailed allegations that defendants were under common ownership and control, that their aggregated receipts exceeded the applicable size

---

[18] *See also* PPP Interim Final Rule II, 85 Fed. Reg. at 23,451.

standard, and that they nonetheless certified PPP eligibility on a disaggregated basis are sufficient to plead submission of a knowingly false certification under the FCA and to satisfy Rule 9(b). *See Twombly*, 550 U.S. at 556-57; *Iqbal*, 556 U.S. at 678-79.

### 2. Count IV | False Record or Statement (Express False Certification)

Count IV alleges that defendants knowingly made or used, or caused to be made or used, false records and statements in PPP loan applications and supporting documentation that were material to private lenders' decisions to fund the loans and to the SBA's decisions to guarantee and forgive them, in violation of 31 U.S.C. § 3729(a)(1)(B). [Dkt. 104, ¶¶ 181-184]. As with Count III, the alleged falsity centers on omissions and misstatements of affiliate relationships and size metrics in documents that directly governed PPP eligibility and forgiveness, thereby rendering those records material under the standard as articulated in *Escobar*, 579 U.S. at 193-95, and as applied by the Tenth Circuit.

Rule 9(b) requires Relators to plead the circumstances of the alleged fraud with particularity, but the Tenth Circuit makes clear that FCA plaintiffs need only show the specifics of a fraudulent scheme and provide a reasonable basis to infer false claims, not attach every form or identify every signatory. *See Lemmon*, 614 F.3d at 1171-73; *Sikkenga*, 472 F.3d at 727-28; *U.S. ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 745 (10th Cir. 2018). Here, the SAC alleges: the nature of the records at issue (PPP borrower applications and a bank-prepared spreadsheet listing loan amounts, jobs claimed, and approval and forgiveness amounts); the role of National Bank of Sallisaw as the originating lender for all but one facility; the relevant

timeframe (loans approved in April 2020 and later forgiven); and the way in which those documents allegedly misrepresented or omitted affiliate status and size-eligibility while containing express certifications of compliance with PPP size standards and affiliation rules. *See* [*id.* ¶¶ 63-67, 68 & n.4, 69-83; Dkt. 104-1].

Defendants correctly observe that Relators do not quote specific application questions or identify the individual who signed each PPP application. However, the Tenth Circuit permits some flexibility under Rule 9(b) where granular application-level data sits in defendants' exclusive control and the complaint otherwise gives each entity fair notice of the alleged scheme. *See George v. Urban Settlement Servs.*, 833 F.3d 1242, 1255 (10th Cir. 2016); *Lemmon*, 614 F.3d at 1173. Applying that standard, the Court concludes that Relators' allegations in and relating to Counts III and IV are pleaded with sufficient particularity to survive a Rule 12(b)(6) motion, and that the precise content and authorship of the PPP-related records may appropriately be developed through discovery.

### C.   ALLEGED MEDICARE FRAUD

Medicare is a federal health insurance program administered by HHS through CMS, which contracts with private MACs to process and pay claims. *See* 42 U.S.C. §§ 1395h, 1395kk-1; 42 C.F.R. pt. 421. SNFs obtain reimbursement by submitting claims in standardized electronic formats that report covered services, diagnoses, and levels of care, functionally parallel to the CMS-1500 and institutional claim formats. *See* 42 C.F.R. pt. 424. Under Tenth Circuit precedent, such claims may give rise to FCA liability when they seek payment for services that are not "reasonable and necessary"

within the meaning of the Medicare statute and CMS guidance, or when they rest on materially false clinical certifications of necessity. *See Polukoff*, 895 F.3d at 742-44 (holding claims for medically unnecessary treatment may be "false" where they do not meet Medicare's "reasonable and necessary" standard).

The SAC alleges that LTC centrally managed clinical operations, billing, and finances for all Facility Defendants and that Kathy Chappell, as COO of LTC Accounting Services, exercised day-to-day operational control, initially at eight "southern facilities"[19] and later across all fifteen facilities. [Dkt. 104, ¶¶ 22-23, 84, 86-89]. Relators allege that, beginning early in the pandemic, Chappell implemented a *de facto* policy requiring staff at the southern facilities—and later at the northern facilities—to place Medicare beneficiaries with a COVID-19 diagnoses code U071.1 on skilled nursing for the full 100-day Medicare benefit period regardless of medical necessity. [*Id*. ¶¶ 88-90]. After August 2021, according to Relator Dunn, Chappell instructed nursing staff in meetings and calls to keep patients on skilled care for 100 days, threatened to terminate staff who refused to use the COVID-19 code, and directed them to fabricate or backfill documentation and progress notes to justify continued skilled care. [*Id*. ¶¶ 93-96, 101].

Relators further assert that "hundreds" of Medicare beneficiaries were kept on skilled care longer than clinically appropriate using the U07.1 COVID-19 diagnosis code to secure higher daily reimbursement than would have been available for non-skilled or shorter stays. [*Id*. ¶ 100]. Relator Morgan asserts that he repeatedly

---

[19] The "southern facilities" include defendants Antlers, Boyce, Calera, Choctaw Nation, Hugo, Jan Frances, Southern Pointe, and Talihina. [Dkt. 104, ¶ 87].

complained to Mitchell and Green about Chappell's "overuse of skilled care," and that in a May 2021 conversation Green remarked, "[i]f we ever get audited we'll get the sh*t kicked out of us," which Relators construe as an acknowledgement the billing practices would not withstand scrutiny. [*Id.* ¶¶ 85-86, 102]. The SAC also alleges that Calera and other facilities subsequently came under MAC review by Novitas for unusually high billing of CPT code 97530, and that sample claim reviews identified many services not "reasonable and necessary," which Relators contend corroborates their allegation that Chappell's directives translated into actual overbilling. [*Id.* ¶¶ 108-114; Dkt. 104-3]. As a representative example, the SAC describes "Patient A," who allegedly remained on skilled care at Calera for 99 days with a primary COVID-19 diagnosis, even though progress notes documented the patient as "post-COVID" and asymptomatic roughly two weeks into the stay. [*Id.* ¶¶ 97-99].

Defendants contend that Counts I and II are deficient under Rules 8(a) and 9(b) and fail to plead falsity. They argue that Relators identify only a single patient example and one MAC "targeted probe and educate" ("TPE") audit at a single facility, yet seek to extrapolate a facility-wide and enterprise-wide scheme across fifteen facilities and eighteen defendants. Defendants emphasize that, apart from Patient A, Relators do not allege that any specific patient's course of care actually followed Chappell's purported 100-day directive, do not plead claim-level data (such as dates, amounts billed, or HCPCS codes) for any allegedly false claims, and do not connect Mitchell or Green to clinical decision-making at the bedside. On falsity, defendants argue that Relators identify no Medicare regulation or ICD-10-CM guidance that

29

prohibited use of U07.1 in the manner alleged, noting that official coding guidance permits U07.1 as a principal diagnosis when COVID-19 is confirmed, including in some post-acute scenarios; in defendants' view, Relators' theory therefore amounts to a disagreement with medical judgment rather than an objectively false claim.[20] Defendants further characterize the Novitas TPE review as evidence only of possible documentation deficiencies or education needs—consistent with MACs' routine use of such cycles—rather than proof of intentional fraud, and maintain that generalized profitability cannot substitute for particularized allegations that any specific claim submitted to Medicare was medically unnecessary or untrue.

### 1.    Count I | Presentation of False Claims (Implied False Certification)

Count I alleges that defendants knowingly submitted Medicare claims for skilled nursing services that were not medically necessary, based on inflated 100-day COVID-driven lengths of stay and misuse of the U07.1 diagnosis, in violation of 31 U.S.C. § 3729(a)(1)(A). [Dkt. 104, ¶¶ 158-162]. Under Tenth Circuit precedent, a lack-of-medical-necessity theory can support FCA liability where the relator ties the challenged care to an objective benchmark—such as Medicare's "reasonable and necessary" requirement—and pleads facts supporting an inference that no reasonable provider would deem the services as necessary in the circumstances. *See Polukoff*, 895 F.3d at 742-44 (holding claims can be false where procedures exceed what is "reasonable and necessary" under the Medicare Program Integrity Manual);

---

[20] *See* CTR. FOR MEDICARE & MEDICAID SERVS., ICD-10-CM Official Guidelines for Coding and Reporting, FY 2025, § I.C.1.g(1)(a) (stating that code U07.1 is assigned for confirmed COVID-19 diagnoses), https://www.cms.gov/files/document/fy-2025-icd-10-cm-coding-guidelines.pdf.

*Lemmon*, 614 F.3d at 1167-69 (recognizing implied-certification theories linked to regulatory conditions of payment). Here, Relators' allegations that Chappell mandated 100-day skilled stays regardless of clinical condition, together with Patient A's 99-day stay after documented resolution of COVID-19 symptoms and a MAC review that many reviewed sampled services at Calera were not reasonable and necessary, provide a concrete factual basis from which the Court can reasonably infer that at least some claims presented to Medicare were objectively unnecessary and therefore false. *See* [*id.* ¶¶ 88-90, 97-100, 108-114; Dkt. 104-3].

With respect to Rule 9(b), *Lemmon* and *Sikkenga* require relators to describe the specifics of the alleged fraudulent scheme and to provide an adequate basis to infer that false claims were submitted, but do not invariably demand exemplar claims for every facility or defendant where critical billing details reside in the provider's exclusive control. *See Lemmon*, 614 F.3d at 1171-73; *Sikkenga*, 472 F.3d at 727-28. Relators here have identified the "who" (Chappell and LTC as centralized managers acting through Facility Defendants), the "what" (100-day skilled stays driven by COVID-19 coding and allegedly fabricated documentation), the "when" (beginning early in the pandemic continuing through at least 2021), the "where" (at the northern and southern facilities) and the "how" (use of U07.1 and extended skilled days to maximize per-diem reimbursement), and have supplied at least one detailed patient example and one MAC-initiated utilization outlier. *See* [*id.* ¶¶ 7, 84-90, 93-100, 108-115; Dkt. 104-3]. Under Tenth Circuit standards, those allegations are sufficient at the pleading stage to render Count I plausible as to the facilities directly implicated

31

by the narrative and audit findings, even if the SAC is comparatively thin in extending the alleged practice to every defendant in the enterprise. *See Lemmon*, *supra*, at 1172-73; *Polukoff*, 895 F.3d at 745.

### 2. Count II | False Record or Statement (Express False Certification)

Count II alleges that defendants created and used false records and statements—specifically, clinical documentation, progress notes, care notes, and certifications of skilled-care necessity—that were material to Medicare's payment decisions, in violation of 31 U.S.C. § 3729(a)(1)(B). [Dkt. 104, ¶¶ 165-69]. This theory dovetails with Count I; if, as alleged, staff were instructed to backfill or fabricate progress notes and other chart entries to justify continued skilled-level care for patients who no longer required it, those records would constitute false documentation of the sort MACs review in determining whether claims for skilled services are payable as "reasonable and necessary" under Medicare. *See Polukoff*, 895 F.3d at 742-44.[21]

Under the Tenth Circuit's integrated Rule 8(a)/9(b) framework, the viability of Count II turns on the sufficiency of Relators' scheme-level allegations and concrete examples. The same facts that support an inference of medically unnecessary claims—Chappell's alleged directives and threats to staff, Patient-A's documented clinical course, and the MAC determination that a substantial portion of sampled services at Calera were not reasonable and necessary—also support an inference that

---

[21] *See also* CTR. FOR MEDICARE & MEDICAID SERVS., Medicare Program Integrity Manual: Chapter 13—Local Coverage Determinations, https://www.cms.gov/regulations-and-guidance/guid ance/manuals/downloads/pim83c13.pdf.

documentation and certifications were manipulated to align with billing, thereby satisfying the knowingly false record or statement element at the pleading stage. *See* [*id.* ¶¶ 88-90, 93-100, 108-114; Dkt. 104-3]; <u>Lemmon</u>, 614 F.3d at 1171-73; <u>George</u>, 833 F.3d at 1254-55. Applying <u>Lemmon</u> and <u>George</u>, the Court concludes that Relators have alleged sufficient particularity to place defendants on fair notice of the documentation-fraud theory asserted in Count II.

### D.   COUNT VIII | RETALIATORY DISCHARGE

The FCA protects employees from retaliation for lawful efforts to prevent violations of the Act. *See* <u>31 U.S.C. § 3730(h)</u>; <u>U.S. ex rel. Reed v. KeyPoint Gov't Sols.</u>, 923 F.3d 729, 738 (10th Cir. 2019). To state a claim for retaliation under § 3720(h), an employee must plausibly allege (1) he engaged in "protected activity" and (2) he suffered discrimination "because of" that activity. <u>Reed</u>, *supra*, at 738; <u>Potts v. Ctr. for Excellence in Higher Educ., Inc.</u>, 908 F.3d 610, 613-14 (10th Cir. 2018). Protected activity encompasses both efforts to stop one or more FCA violations and conduct that could reasonably lead to an FCA action, even if it does not involve filing a *qui tam* suit or contacting government authorities. <u>Id</u>. at 765-66.

Here, the parties' dispute centers on causation. Defendants contend Relator Morgan fails to plausibly allege that his termination resulted from protected activity rather than ordinary business considerations. They also note that Morgan's alleged internal complaints concerning Chappell's billing and clinical practices occurred more than three years before his termination. [Dkt. 111 at 31-32 (*citing* Dkt. 104, ¶¶ 102, 118)]. The Tenth Circuit applies a "but-for" causation standard in FCA retaliation

33

claims, evaluated at the pleading stage under Rule 8's plausibility framework. <u>Reed</u>, 923 F.3d at 739-41. Temporal proximity may support an inference of causation, but only where the protected activity is "closely followed" by an adverse employment action. the interval between the protected activity and termination is very close. <u>Foster v. Mountain Coal Co.</u>, 830 F.3d 1178, 1191 (10th Cir. 2016) (stating that "a one and one-half month period between a protected activity and adverse action may, by itself, establish causation [,but] a three-month period, standing alone, is insufficient to establish causation."). Although protected activity may be "ongoing" such that later acts can renew the causation analysis, <u>Reed</u>, 923 F.3d at 740-41, Morgan's allegations do not plausibly support such a theory here.

Morgan asserts that his objections to Chappell's practices began "[b]y at least 2017." [Dkt. 104, ¶ 85]. The SAC, however, identifies only a single, discrete complaint to Green "on or about May 3, 2021." [<em>Id</em>. ¶ 102]. The SAC further alleges that (i) Morgan's complaints "caused friction with Chappell, who saw Morgan as a rival and an obstacle to her efforts to maximize Defendants' profits (and enrich herself)," (ii) Chappell told Relator Dunn in or before March 2022 that Morgan "would be gone" by May 2023, and (iii) Morgan's termination "was orchestrated behind the scenes by Chappell, who had considerable sway with Mitchell and Green because she was making so much money for them." [<em>Id</em>. ¶ 106-07, 117-18]. Morgan alleges no disciplinary actions, threats, or other retaliatory conduct tied to his May 2021 complaint, nor does he allege intervening events bridging the three-year period between that complaint and his December 2024 termination. The absence of such

factual allegations weighs heavily against a plausible inference of but-for causation. *See* <u>Potts</u>, 908 F.3d at 616.

Accordingly, while Count VIII sufficiently alleges that Morgan engaged in protected activity under the FCA, it fails to plausibly allege that his termination occurred "because of" that activity. The extended temporal gap and absence of specific, nonconclusory facts connecting his FCA-related conduct to the termination decision collectively preclude a reasonable inference of retaliatory motive. Defendants are therefore entitled to Rule 12(b)(6) dismissal of Count VIII.

## VI.  LEAVE TO AMEND

Rule 15(a)(2) provides that courts "should freely give leave [to amend] when justice so requires." <u>Fed. R. Civ. P. 15(a)(2)</u>. However, leave to amend may properly be denied upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by previously allowed amendment, or futility of amendment. <u>*Frank v. U.S. West, Inc.*</u>, 3 F.3d 1357, 1365 (10th Cir. 1993). Rule 7 further requires a request for relief to be made by a motion, which must be in writing, state with particularity the grounds for seeking the order, and specify the relief sought. *See* <u>Fed. R. Civ. P. 7(b)</u>, <u>*Albers v. Bd. of Cnty. Comm'rs of Jefferson City, Colo.*</u>, 771 F.3d 697, 706 (10th Cir. 2014). Thus, courts routinely deny leave to amend when a party "merely suggest[s] she should be allowed to amend if the court conclude[s] her pleadings [a]re infirm." <u>*Warnick v. Cooley*</u>, 895 F.3d 746, 755 (10th Cir. 2018) (citation and internal quotations omitted).

In this case, Relators were initially granted leave to amend their original

complaint for the limited purpose of removing Relator Morgan from the action "to avoid potential negative impacts on his professional reputation" and "other negative consequences that whistleblowers often suffer." [Dkt. 22 at 2]. Following defendants' first motion to dismiss, Relator Dunn was again granted leave to amend for the express purpose of reinstating Relator Morgan as a party to the case. [Dkt. 77 at 1]. Although defendants now contend that any further amendment would be futile because Relators have already had the benefit of reviewing one motion to dismiss, the Court notes that Morgan's claim for retaliatory discharge was not previously at issue when defendants filed their initial dismissal motion. Relators' response does not substantively engage with defendants' futility argument and instead merely offers a bare request "that the Court afford them opportunity to replead." [Dkt. 121 at 28].

It is well-settled in the Tenth Circuit that such cursory, "drive-by" requests to amend a complaint do "not rise to the status of a motion." *Glenn v. First Nat'l Bank*, 868 F.2d 368, 370 (10th Cir. 1989); *accord Albers*, 771 F.3d at 706. Relators offer no proposed amendments or new factual allegations that would permit the Court to evaluate whether further amendment could cure the deficiencies identified in Count VIII. *See id.* at 371; *Albers*, *supra*, at 706. Nevertheless, in the interest of fairness, the Court will afford Relators one final opportunity to amend their operative complaint.

## VII. CONCLUSION

WHEREFORE, the motion to dismiss [Dkt. 110] and brief in support [Dkt. 111] filed on behalf of all defendants is hereby **GRANTED in part** and **DENIED in part**.

However, Relators are granted ten (10) days from the date of this Order, or until **APRIL 2**, **2026** to file a motion for leave to file a third amended complaint in accordance with LCvR 7.1(k).

IT IS SO ORDERED on this 23rd day of March, 2026.

_____
JASON A. ROBERTSON
UNITED STATES MAGISTRATE JUDGE